14-3014 Fowler v. USPS Mr. Harrelson, whenever you're ready. Thank you. May it please the court? Why don't you hold a minute? I was rushing your friend on the other side. He hasn't had a chance to unpack. There is quite a bit to pack. My name is John Harrelson, and I represent the petitioner in this matter, Teresa Fowler, in regard to her termination after 16 years of service with the Postal Service. We're appealing the decision of the MSPB reaffirming or affirming the decision of the administrative law judge below. Our position on this is that Ms. Fowler followed the express terms of a policy dealing with reimbursement of expenses incurred in a duty assignment in Telle Isle. Her normal assignment was to the post office in Oskaloosa, Iowa. The towns are about 20 miles apart. Ms. Fowler provided that assignment. Are you saying that under just the regular travel rules, given that she was placed in this position, which is still within the 50-mile radius of her duty station, that she is automatically entitled to travel with her dam? The particular policy says it has to be outside of 50 miles for regular travel, or if it requires an overnight stay. And who gets to determine what requiring an overnight stay, when the circumstance exists? Well, by the rules, as they're written, the approving official, an official who's authorized to approve travel expenses, which per Appendix C, as it's defined, we believe Ms. Fowler followed. The technical aspect or break of this is that the Oskaloosa Post Office is in Area 7 of the UPS. Who was her supervisor at Oskaloosa? The name escapes me. It was not Mr. Ingleheart, who's the postmaster in Ottumwa. The area manager for a period of time was Ms. Bailick, but then she was replaced. But the short answer is her supervisor at Oskaloosa or her supervisor at Pella were not the people approving her travel. Well, she was the OIC officer in charge of Pella in the structural diagram of Area 4. She had a different supervisor that wasn't stationed in Pella, was stationed in some other time. Under your interpretation, wouldn't that mean that any supervisor with travel approval authority could approve her travel? Not necessarily. What matters is whether or not that individual has the authority. There is a logical reason for... Well, that's what I just asked. If the person has travel authorization, your theory is she could go to anybody. I believe that who she went to was... So she could go to somebody in California that had travel authorization and say, please approve my travel. As we interpret policy, as the Postal Service wrote the policy, technically you could do that. Yes. Well, how can that possibly be right? As we talked earlier, this isn't necessarily norm or automatic that you get regular travel in these circumstances. Someone has to decide that it's a necessary prerequisite that you have to be there overnight. Well, if you aren't supervising this employee with regard to her tasks and her responsibilities, how can you possibly be in a position to make that determination? The reason that Ms. Fowler believed that she had that authority is what Mr. Engelhardt had related to her from a conversation he claimed to have had with Ms. Sussner. When they were saying that overnight stay would be required, Ms. Sussner denied it. So what we're left with is, what does the policy say? And the policy talks about an approving official. What the Postal Service says is that you have to approve it beforehand, right? You prepare and submit the paperwork and have the trip approved before you were scheduled to depart. Was that done in this circumstance? Actually, I believe the policy, the 1011 that they're talking about, is for non-bargaining unit employees. How do I tell that? I'm sorry, for bargaining unit employees. It does not apply to non-bargaining unit, which is what Ms. Fowler... I'm looking at A181. Does certain portions of this apply to bargaining unit and certain apply to non-bargaining unit? That's correct. Because I can't tell. So how am I supposed to know which applies to who? Well, the way that extended detail is, or the way that employees are on extended duty assignments, it says the appropriate approving official must extend all assignments in writing. And the approval is based on a set of factors. Where are you reading this? I'm sorry, I'm on A754. I believe that these regulations are written there twice. This is from the agency's appellate designation 2-2.1.2. You said 754? Yeah, A754. But where the issue in the regulations comes down to, when does this become extended duty and when is it a temporary assignment? Well, I don't understand. What I was talking about was this pre-approval, and as I'm looking at the right thing on page A754, my eye just glanced at the third sentence, which said the approval should be... ...approve all extended duty assignments on details in advance and in writing. Does that not include the travel authorization? That would be one of the factors, yes. But what Ms. Fowler testified is that, and it was Ms. Sussner who was looking for an individual to fill the Pella vacancy. Ms. Fowler was recommended. Ms. Fowler expressed concerns that she had to Mr. Engelhout about the cost and expense of doing this assignment. Now, she would have taken the assignment with or without the... Well, if he wasn't the one that did the assignment, doesn't an employee normally expect it and would otherwise... If I have a concern about the assignment, I go to the person responsible for giving me the assignment to raise those concerns. Ms. Fowler believed that she had that from Ms. Sussner via Mr. Engelhout. I don't understand that. Mr. Engelhout told her that her supervisor had delegated all of her supervisory authorities to him and therefore he was now in charge of... Ms. Sussner had told Mr. Engelhout that she would be eligible for overnight or regular travel. I mean, that's your view of the facts, but that's not what the board found, is it? The board disagreed with Mr. Engelhout on credibility. This is not a de novo review for us. So she testified the opposite. Isn't that substantial evidence to suggest that she never said that? What I'm arguing is that credibility issues, being what they are, the policy says what the policy says. The post office drafted the policy... Aren't you confusing people that have the authority in theory to approve travel with the actual approval on a day-to-day basis of people's supervisors? I'm relying on the policies that the post office has enunciated and what they say. But didn't the post office also put on evidence that they expect people to have their supervisors approve travel? They also testified they have no written policy in that regard. Do they have to have a written policy? They have to, I believe, through the case that was kindly submitted by the government, the government has to prove that they do have this unwritten policy by substantial evidence. Isn't there testimony to that effect? There's testimony as to the reasons... I mean, there's no doubt that Ms. Fowler knew that she had to get stuff approved by her supervisor because the government points to lots of different requests that she did get approved by Ms. Susanar, if I'm pronouncing the name right. Correct. Why didn't she ask for her travel to be approved by her as well? As the record showed, she made an initial effort. Perhaps she should have made a more complete effort, but... Well, clearly she wasn't having a problem getting approvals from her supervisor because she did that for other things. She just didn't do it for travel. Because she was told by Mr. Engelhout to go ahead and submit travel submissions to him because he was an authorized approver. Credibility determinations were made specifically that it was not credible that she really couldn't get a hold of her supervisor for purposes of these travel reimbursements. So she may have said, I tried and couldn't get a hold of my supervisor, but the administrative judge found that not to be credible and the board adopted that credibility determination. That's correct. But what I'm saying and what we are arguing is that the policy matters. What the policy is, what it says... You're arguing that the written policy overrides all these factual findings that the board made that are supported by substantial evidence. The Postal Service should abide by their rules and policies. Ms. Fowler did. She followed the literal terms of that policy. The policy means what it says, not what the Postal Service wants it to mean. They wrote it. They are responsible for its statement. If they wanted to say your immediate supervisor, your only supervisor... But it seems like you may be the only one who doesn't appreciate that it was your supervisor because it seems like all of the other players did. She says she tried to get her supervisor to approve it, but her supervisor was too busy. So at some level she understood this was the go-to person. You tell us that Mr. Engelhoff said not I think you should do this, but you told us earlier that he said I talked to your supervisor and she said I could. So it seems like whether there's ambiguity in the policy or not, everybody involved in this process understood that it's the supervisor, her supervisor, who's in charge of approving her travel. What am I missing? Only that there is nothing improper about submitting a proper and correct travel expense to an approved official, which Mr. Engelhoff was. Ms. Sussner as well. Ms. Sussner got monthly reports of these expenses. The government or the agency doesn't contend that the amount allocated is improper, only that she made the submission. Well, actually they do contend that only local expenses were allowable. And your argument is that somehow that was overcome by this informal conversation between Ms. Sussner and her original supervisor. But the rules are what they are. If she's not entitled to anything other than local expenses, then the rules say that the employee is responsible for only asking for allowable expenses. So couldn't that be the end of the inquiry? She asked for expenses that were not allowable regardless of who she asked? We believe that the policies entitled her to regular travel. What she was doing on that assignment was regular travel, as the post office says most travel is. We believe that she was entitled to that. But I'm assuming she was entitled to stay overnight in the first instance. And you're usually not entitled to stay overnight when it's something within your local commuting area. But it's not excluded by the regulations. It says 50 miles or more. She's the one that gets to decide this. She's the one who expressed these concerns, Mr. Engelhoff, who said that he had talked to Ms. Sussner, who said that that was the case. That's not credible, though. I mean, the board rejected all of that. You're arguing a version of the facts that the board didn't find. And we're not reviewing, DeNovo, your version of the facts. We're reviewing what the board found is supported by substantial evidence. Is there any place to suggest that her supervisor actually approved her staying overnight at a hotel in these places? Except for this testimony that was rejected. The testimony that Ms. Fowler relied on is the testimony, Mr. Engelhoff, that the administrative law judge found not to be credible. That's correct. But we believe that the functional actions of what she was doing in that job as an OIC, which another definition for regular travel is how long these assignments last. This assignment had lasted five months and had no ending to it. It was indefinite. An indefinite assignment as an OIC also converts to regular travel. The assignment was only how many miles away from her permanent duty station? Eighteen, I believe the testimony is. Seventy miles from home. I mean, no reasonable government employee would expect to get hotel for a detail 18 miles away. I mean, that's like from here to Dulles Airport. I mean, people commute farther than that every day to D.C. But the basis of how, but again, the transformation from a temporary assignment into an extended assignment also converts it to regular travel regardless of distance. Why don't we hear from the other side? Thank you. Thank you, Chief Judge Frost. May it please the Court. The Court should deny the review petition in this matter and uphold the Merit System Protection Board's conclusion affirming the agency's removal of Ms. Fowler because substantial evidence supports the determination that she claimed and received more than $13,000. Let me ask you just on the last point that your friend raised. Under the rules, is there some sort of presumption or do matters change if a position is characterized as extended or indefinite? Does that create a presumption or an automatic entitlement to have overnight travel on per diem? No, it does not. The rules are whether it's local travel or regular travel. So what, if any, impact does it have that designation as something that's indefinite or an extended position? What is the relevance of that in this case? Well, I'm not actually sure, Your Honor, and I would be happy to look into that further. But my understanding of this matter is that because it was a detail, the proper interpretation of what travel entitlement she had is done with reference to whether the travel claimed falls under the local travel or the regular travel rule. And I don't have a direct answer to Your Honor's question about the indefinite. Is it anywhere in the record what, if anything, occurred with respect to Mr. Eaglehawk in terms of this incident? Is that in the record? Yes, that is in the record. And what does that indicate? Mr. Eaglehawk first testified that he retired. Then toward the end of his testimony, he conceded that he had been removed. Substantial evidence supports the agency's determination on basically two functional grounds. There's the issue of whether she's entitled to the expense, and then there's the issue of who she submitted it to. Is there anything in writing that requires people to get travel approved by their immediate supervisors? There is. It's 2-2.5, which can be found... Well, it just says that each traveler is designated an approving official or approver. Exactly, Your Honor. But where was it designated that the approving official or approver was not Mr. Eaglehawk? It doesn't say that. That's correct. And the regulations, I'm the first to admit, are not elusive on the issue of immediate supervisor. But here's what they do say. If you look at, on page A-757, section 2-2.5, I'm going to read just two sentences. All e-travel expense reports must be electronically submitted to the specified approving official. An approving official or approver is designated for each travel. So where was the designation for her? Absolutely. It talks about the specified approving official. It doesn't say any approving official. Where is the specification? The specification comes from the context of the entire handbook. For sure, it does not say her immediate supervisor. That's true. It does not say that. Right. And Sassenger, she testified that she had approved expenses from outside her chain of command in the past. She had under circumstances that didn't exist in this context. The general rule about who approves agency travel was testified by many different witnesses. And the rule that has emerged is that your immediate supervisor – But getting back to my question, there's nothing in writing about this. There's nothing in writing saying – That says you have to go to your immediate supervisor. But everybody understands that you get a travel request approved by your supervisor. That's the testimony. That's correct. And, Your Honor, I did not mean to interrupt you just a moment ago. There is nothing in writing saying immediate supervisor. But what there is is specified approving official. There's language that says an approving official is designated. It does not say any approving official, which undercuts – Okay, but the answer is no one was ever designated, right? Except by this informal view that you think people sort of get that it's their immediate supervisor who's designated. There was no – perhaps there was nothing in the record saying that there was a written designation. However, a supervisor was definitely designated, and that's because of the ample record testimony and definitely substantial evidence that the Postal Service is a very chain-of-command type of organization. But is there testimony suggesting that during orientation or training or the like that travel requests go to your supervisor? I'm not aware if it was in that, but it is in the manual. It says ordinarily travel will be approved by your immediate supervisor. I believe that's maybe 4.1.1. I have it here. I can grab it. Yes, it is. It is 4.1.1, which is A181 of the record. But I thought your friend said that that just applied to bargaining unit employees and not to misfile. Maybe I misunderstood. But does this handbook apply exclusively to bargaining unit employees? I believe this handbook applies to all employees except for if there are any places where it is indicated that it is not. And here it says typically your immediate supervisor notifies you about an upcoming trip and then proceeds to talk about how you have to get approval ahead of time and those sorts of things. And my friend has not articulated a basis for saying that that does not apply. Moreover, even if it was not written, we do have ample testimony saying this is a chain-of-command situation. We knew the approving official for her Carthage detail, for instance, was the person of the same rank as Susteniar. I don't mean to mispronounce that. But it was the same approving official back when she was in the Carthage detail. So why did she not submit it to the equivalent person here? So you're relying on your now legal theory that was raised for the first time in your supplemental filing, which is that you can have an informal policy that becomes a policy. Is that right? Well, the legal basis of this we did discuss. And apologies to the Court for only disclosing that. 1998 case, that case is old enough to have a driver's license. So why is it that it took you until yesterday to find it? We disclosed the case to the Court as soon as we learned that we had not included it in the brief. I can't give you a better answer than that. But I do apologize for the delay in raising it. But the factual basis of that had been in the record the entire time because of all the testimony by witness after witness saying, yes, this is the policy. And even if we did raise it late, and I do apologize again for that, it is still the law. And there is evidence showing that this policy exists. And even if the Court were to conclude that the government was obligated to carry its burden of proving it. What's your best piece of evidence that this policy exists? We have testimony from Sussnar herself who says that I was her supervisor and I would not have approved this. We also have testimony from the other witnesses, I believe, Berg, Ms. Ryan, who is the deciding official. When you read them all together, or even one of them by itself is substantial evidence. Well, there were a lot of inconsistencies in their testimony, weren't there? There were a lot of inconsistencies in Ms. Fowler's testimony which led her to be found not credible. But another piece of evidence to answer Judge Hughes' question is that Ms. Fowler herself knew that she needed to submit these travel vouchers to Ms. Sussnar. And the way that we know that she knew is that of the various inconsistent and shifting explanations that she gave for why she only submitted them to Mr. Engelhout, one of them was that the first time that she tried to submit one of these vouchers was that she tried to submit it to Ms. Sussnar. And that shows us that she knew about this policy. Now she, of course, later changed her explanation and said, oh, well, I tried to and it didn't work. Well, then she said, I couldn't find her name in the system. Or she said that my travel voucher was getting stale even though it had only been about nine days since the travel had started. So all of that is substantial evidence. So getting back to the two basic charges that were against her, fundamentally it was you claimed expenses you weren't entitled to and you sent them to the wrong person. As for the first one, the adverse credibility finding is a sufficient basis to sustain that charge given the other evidence. And as for the other charge about submitting it to the wrong person, there's ample record evidence supporting that as well. The fact that she had submitted it to the same level of supervisor back in Carthage is just one example of the evidence that supports that. And so once we get to the fact that there's substantial evidence supporting all of the removal charges, then the court's evaluation was the removal within the discretion of the agency. And here the agency considered all the Douglas factors which the court is required to evaluate. The agency looked at the egregiousness of Ms. Fowler's misconduct. It evaluated the fact that she's a supervisor and had been one for about eight years, and that supervisors are entitled to be held to a higher level of responsibility. It looked at the fact that she did not accept responsibility for her misconduct, which again consisted of her submitting vouchers not to a manager but rather to somebody who was a lateral with her, a post inspector, postmaster, apologies, in another office, but certainly not one of the managers to whom she'd been operating with on a daily basis. For instance, she submitted her leave requests to Ms. Sussnar. She conferred weekly with Ms. Sussnar on operational matters. So we know that she knew about this. So having considered all the Douglas factors and selected a reasonable penalty, there's no basis for the court to overturn the agency decision and the Merit System Protection Board. Thank you. Thank you. Mr. Harreld, you have a minute left in rebuttal. Thank you. The one aspect that I didn't get addressed in my opening portion was the nature of the penalty imposed on an employee that had no prior disciplinary record, had been with the Postal Service for 16 years, for violating a policy that she followed the literal terms of, and the agency is arguing that she didn't follow what they believe they mean. This is an individual who, so they made the determination that that employee should be terminated for not following the proper procedure on expense vouchers and self-enrichment. The self-enrichment by Ms. Sussnar's testimony was staying at a hotel and being seen at a hotel with Mr. Engelhardt. When she was inquired, what is the self, how is she self-enriching herself, they were married. The implicit belief, without proof, that they were having a relationship, which they both deny, played a substantial role in this discharge. Not, we would contend, the fact that the literal terms of the policy were followed. If she interpreted those policies wrong, the self-enriching proportion, I know Pella is a lovely town, but the Holiday Inn at the Pella is not exactly the Four Seasons. You have a final remark because we're out of time now. Alright, thank you.